DECISION
Defendant-appellant, Shannon D. Haynes, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to a jury verdict finding appellant guilty of one count of kidnapping, one count of rape, one count of voluntary manslaughter, and two counts of murder, all with sexually violent predator specifications. The charges against appellant all arose in connection with a single death, that of Kara Parrish, which the defense conceded occurred in appellant's residence at 1608 Summit Street, apartment four, in Columbus, early on the morning of May 20, 2000. The general theory of the state's case was that, although the victim (Kara) and appellant were acquaintances and the victim had voluntarily accompanied appellant to his apartment after an evening of drinking, appellant had thereafter bound the victim with an electrical cord or similar object, raped her, and purposely caused her death by asphyxiation through application of a choke hold or other means of compression to her neck. The principal theory presented by the defense was one of consensual "rough sex" during which the victim died either as an unintended result of the consensual activities undertaken by her and appellant, or as a result of the combination of alcohol use, illicit drugs, heart medication, and a recently diagnosed heart condition.
The first witness presented by the state was Lawrence Wolfe, Jr., who resided at 1608 Summit Street, apartment two, directly beneath appellant's apartment. Wolfe's testimony was that he had on the evening in question attended alcoholics anonymous and narcotics anonymous meetings, eaten at a restaurant, and returned to his apartment at 11:30 p.m. Wolfe's room was in the basement, and between 1:30 and 1:45 a.m., when he went upstairs to use the bathroom, he heard a woman scream, "get off of me, you are hurting me and choking me." (Tr. 58.) He also testified that he heard appellant shouting, "I will tie you up." (Tr. 59.) Wolfe then called 9-1-1 to report what he had heard to the police. A tape of Wolfe's call to 9-1-1 was played in court, and in it he reported, "the people upstairs in apartment three are yelling and fighting for a couple of hours." (Tr. 59.) Wolfe explained in court that he had intended to report a problem in appellant's apartment, number four, and made a mistake in specifying apartment three as the location of the yelling and fighting. Wolfe testified that he went back to bed after making the call, and was not aware of any immediate police response. The following morning around 5:30 a.m., Wolfe saw police officers and orange crime scene tape around the house and became aware that a crime was being investigated.
On cross-examination, defense counsel impeached Wolfe's testimony by pointing out inconsistencies with two prior statements he had made to police. Wolfe acknowledged that he had previously told the investigating detective that he had returned home at 1:30 a.m., rather than at 11:30 p.m. The 9-1-1 call made by Wolfe occurred at approximately 1:45 a.m. Wolfe admitted that he had lied when making his previous statement to the investigating detective. Wolfe further testified that he had lied in two other respects when speaking with investigating detectives. Wolfe testified that he had previously lied when he told the detective that he had never heard appellant's voice from upstairs during the altercation, and that he had lied when he previously told the detective that he had overheard the voices from the upstairs apartment through the ventilation ductwork in his basement bedroom, rather than through the ceiling when he went upstairs to use the bathroom.
The state also presented the testimony of Anthony Bell, appellant's half-brother. Bell testified that he lived in the campus area, not far from appellant's apartment. On the morning of May 20, 2000, Anthony received a call at approximately 2:30 or 3:00 a.m. from appellant, asking him to come over to appellant's apartment by himself. Appellant did not specify a reason for this request. When Anthony arrived at appellant's apartment, appellant came out onto the porch and his first words were, "drunk, I didn't mean to do it." (Tr. 99.) Appellant then asked Anthony to enter the apartment, and requested that he "not freak out." (Tr. 99.)
When Anthony entered the apartment he observed the body of a young woman lying on the floor, wearing jeans and a bra, but no shirt. He did not recognize the woman. Anthony observed that the woman's skin color seemed bluish and Anthony, startled, asked appellant if she was dead or alive. Appellant used his foot to nudge the woman in the head, and stated, "yeah, she is dead." (Tr. 100.)
Appellant then asked Anthony to help him move the body to her car. Anthony refused. When Anthony asked how the woman had died, appellant stated that he had choked her. When Anthony asked why, appellant stated that she had black-mailed him.
After Anthony had refused to help appellant move the body, appellant picked the body up and carried her over his shoulder out the back door of the apartment which opened onto a steep flight of steel stairs down to a parking lot at the rear of the building. As he did so, appellant commented on how heavy the body was.
Anthony then left appellant's apartment and returned to his home, where, shaken, he told his girlfriend what he had seen. Anthony then called his father, Michael Bell. Anthony and his girlfriend agreed to meet with his father and mother immediately to discuss the situation. Mr. Bell and Anthony's girlfriend returned to the vicinity of appellant's apartment, but Anthony Bell did not accompany them.
On cross-examination, Anthony stated that during the evening before he was called to appellant's apartment he had consumed some liquor and beer, and smoked marijuana.
Patrick Staunton, an Ohio State University student and part-time bartender at the Cornerstone bar, testified that on the night in question he was tending bar and served appellant and Kara at the bar. From their friendly interaction, he assumed that appellant and Kara were on a date. About two hours later, they left at approximately the same time, although Staunton could not be certain that they left together. Appellant was a regular at the bar, and Staunton knew him well by sight. That night, appellant consumed several potent mixed drinks known as "Irish car bombs," and some beer. When he and Kara left, however, neither appeared to be overly intoxicated.
Columbus Police Officer Steven Warrick testified that he was dispatched with a fellow officer to respond to Wolfe's 9-1-1 call at 1:50 a.m. The officers obtained no response when they knocked with their flashlights on the door of apartment three, the apartment incorrectly specified by Wolfe as the location of the disturbance. The officers also knocked on the door of apartment two, where they believed the 9-1-1 call to have originated, and obtained no response. Officer Warrick testified that he did speak briefly with a man in apartment one, obtained no useful information, and left the area after checking outside the premises.
Officer Warrick testified that he and other officers were involved later that morning in making an unrelated arrest at a convenience store in the vicinity when Mr. Bell approached the officers with information about a possible homicide in the vicinity of 12th and Summit Streets. The officers followed Mr. Bell to appellant's apartment. Based on the information provided by Mr. Bell, the officers spoke with appellant, then escorted him from the apartment to a police van and secured the scene. While the officers were on the premises they obtained information that a body had been found in a car parked nearby.
Officers Patrick Shaffer and Kenneth O'Quinn also arrived at appellant's apartment at this time and entered through an open rear door after observing a woman's white undergarments on the steps of this rear exit. Appellant was found in the rear room of the apartment, and was identified by his stepfather, Michael Bell, as the person who reportedly had killed a woman in his apartment. These officers, as did Officer Warrick, testified that appellant did not appear intoxicated and was cooperative with the officers. Appellant told the officers that nothing had happened in his apartment, and that no one had been hurt. Appellant also told the officers that he had neither a stepfather, nor a step or half-brother, leading officers to ask Michael Bell to confirm the identify of appellant.
Kara's body was discovered partially clothed and locked in her own car parked behind an apartment building a short distance from appellant's apartment. Local residents called 9-1-1 between 4:30 and 5:00 a.m. upon discovering her, and police quickly concluded that this was probably the body of the victim that Anthony Bell had observed in appellant's apartment.
Forensic pathologist Patrick Fardall testified for the state regarding his autopsy of Kara Parrish. Dr. Fardall described numerous minor abrasions, contusions, and bruises over Kara's body. Most of these injuries appeared to have incurred before death, although some might have been post-mortem. Some of the scrapes and bruises on her back were consisted with having sex on a carpeted floor. Both of Kara's wrists and both ankles bore ligature marks consisted with having been bound moderately tightly with an electrical cord. Dr. Fardall was shown an extension cord which had been seized from appellant's apartment, and described it as consistent with the injuries on Kara's wrists.
Dr. Fardall also observed a degree of tearing and bruising of the rectum consistent with anal intercourse. Semen was obtained through swabs of the rectal area, but none was obtained through vaginal swabs.
The most significant injuries observed by Dr. Fardall were petechial hemorrhages in Kara's eyes reflecting death through oxygen deprivation. Dr. Fardall also noted small hemorrhages in the deep tissues on the back of the neck and base of the skull, consisted with displacement of the head and neck due to an application of force. Dr. Fardall did not, however, note any external bruising around the neck or throat which would have resulted from ligature or manual strangulation.
Dr. Fardall's professional conclusion as to the cause of death was as follows:
"I think Ms. Parrish's death is solely and exclusively related to the compression injuries that she suffered to her neck. And as I alluded to before, all of the petechial hemorrhages and the other types of hemorrhages we saw at the time of autopsy go to saying that at some point in time her neck got compressed, and this was the main reason why she died." (Tr. 410.)
Dr. Fardall was unable to ascertain exactly the amount of force or the manner in which it had been applied to Kara's neck, but hypothesized that the hyperextension of her neck was consistent with a chokehold applied from a forearm or the crook of an elbow, either of which could have applied the necessary force without leaving marks on the skin.
On cross-examination, Dr. Fardall stated that it was possible for death to result within seconds if the neck were massaged, compressing certain nerves that will stop the heart. Dr. Fardall could not rule this out as a cause of death of Kara Parrish. Dr. Fardall also described, however, his evaluation of Kara's heart, which he ascertained to be normal despite information that she had shortly before her death begun taking heart medication. Dr. Fardall saw no indication that her recently diagnosed unspecified heart condition, the medication she was taking for it, or the drugs or alcohol she had consumed on the night in question had caused her death. Toxicology reports on Kara reflected consumption of alcohol and methylenedioxy-methamphetamine, commonly known as ecstasy, and metoprolal, a prescribed heart medication.
The defense subsequently stipulated that DNA testing would confirm appellant as the source of the semen sample obtained from Kara's rectum.
The evidence presented by the defense was primarily directed to establishing that appellant was so intoxicated at the time of the crime that he was unable to form the intent required as an element of the crimes charged. This evidence was also intended to show the friendly, if intermittent, relationship between appellant and Kara prior to her death. The defense also attempted to introduce evidence attempting to show that Kara would have been a willing and consensual participant in the "rough sex," including use of restraints and anal sex, and thus was neither restrained against her will or forced against her will to engage in sex.
Bartender Staunton was recalled to testify for the defense on the quantity of alcohol which he served to appellant that evening: three or four "Irish car bombs," a pitcher of beer and a "Mexican car bomb." Staunton also described the content and potent nature of the mixed drinks named above. Eric Hamilton, another bartender at the Cornerstone bar who worked the shift preceding Staunton's, stated that appellant arrived that evening between 3:30 and 4:00 p.m., and consumed a 60 ounce pitcher of beer, two or three "car bombs," and two shots of tequila prior to Staunton's arrival at 8:00 p.m. Hamilton knew appellant personally and had been to his apartment for help with his computer, and therefore was certain of appellant's identity as the person he observed drinking on the night in question.
Christina Steinman and Bruce Cobb testified that they also saw appellant in the bar on the afternoon and evening of May 19, 2000, drinking steadily. Mr. Cobb bought four shots of tequila for appellant.
Carol Coleman lived in apartment one at 1608 Summit Street. She testified that no police officers came to her door in the early morning hours of May 20, 2000, which contradicted the prior testimony of Officer Warrick. At no time on the night of May 19, 2000 to May 20, 2000 did she hear a woman scream.
Virginia Ferrell lived in apartment three at 1608 Summit Street. She knew appellant and his wife, who both resided in apartment four with another roommate. On the night of May 19, 2000, she was sitting on her porch with her sons and some neighbors when appellant and Kara arrived with their arms around each other. Kara had to help appellant up the stairs because appellant was apparently very intoxicated. Ms. Ferrell noted that the couple appeared to be in a happy mood, and gave no evidence of arguing or disagreement. When Ms. Ferrell when upstairs, she passed the open door to appellant's apartment. She observed appellant lying on the couch and Kara speaking to several other unknown individuals in the apartment. Ms. Ferrell heard no yelling or screaming that night, and she testified that no police officer knocked on her door around 1:50 a.m., the time at which Officer Warrick testified that he spoke with one of the residents of the building.
Dolores Daniels testified that she lived in apartment two at 1608 Summitt Street with other family members including her brother, Lawrence Wolfe, who had called 9-1-1 with the report of a disturbance upstairs. She testified that she was sitting on the porch with Virginia Ferrell and other neighbors when she saw appellant return to his apartment between 11:00 and 11:30 p.m. with Kara. Like Ms. Ferrell, Ms. Daniels testified that appellant was visibly drunk, and Kara had to help him up the stairs, telling him when to step. Ms. Daniels testified that she told appellant he had had one too many that night, and he agreed. She testified that earlier that evening, she had seen Kara park her car behind the apartment building around 5:00 p.m. and then leave with appellant. She was aware that appellant's wife had left for Cleveland earlier to attend a concert.
Ms. Daniels' 15 year old son, Charles Daniels, who also resided in apartment two, similarly testified that he saw appellant and Kara return and appellant appeared extremely drunk. Charles testified that it was his belief that if Kara had not helped appellant up the stairs, appellant would not have made it up to his apartment. Appellant's speech was slurred, and both he and Kara appeared to be in a good mood. Charles knew Kara because he had helped appellant jump-start her car on an earlier occasion. After appellant and Kara were observed coming home, Charles stayed up late to watch a movie. His uncle, Lawrence Wolfe, returned home after 2:00 a.m. Charles saw Shawn Shady, who shared apartment four with appellant and appellant's wife, return home after appellant and Kara had arrived. Charles heard no screaming or yelling during the night.
The defense presented two witnesses who testified about the rate of alcohol consumption to achieve a given blood-alcohol level, and the effect of such blood-alcohol level upon individual behavior. Dr. Alfred Staubus, a professor in the College of Pharmacy at the Ohio State University, presented charts showing calculated ranges of blood-alcohol consumption for appellant based upon anticipated testimony of appellant's alcohol consumption through the evening and night of May 19, 2000. His calculations took into account appellant's height and weight, the number and type of drinks he was described as having consumed, and the time of consumption. The computations yielded a fairly wide range of possible blood-alcohol levels due to variations in possible drink sizes, and individual variations in human metabolism. Between 1:00 and 2:30 a.m. May 20, 2000, the time at which the prosecution postulated the crimes to have occurred, Dr. Staubus' computations yielded a blood-alcohol range between 0.117 and 0.374, depending on the variables described above and the time elapsed between 1:00 and 2:30 a.m.
Dr. Staubus gave significance to these numbers by describing the various levels of alcohol intoxication in humans. Dr. Staubus stated that blood-alcohol levels between 0.01 and 0.05 can be described as the "sobriety stage" in which behavior remains generally normal. This is followed by the "euphoria stage" falling between 0.03 and 0.12, with these described stages thus containing some overlap. In the euphoria stage, effects would include a reduction in attention span, judgment, and self-control. The next higher level would be the "excitement stage," falling between 0.09 and 0.25, leading to loss of inhibition, emotional instability, loss of critical judgment, memory lapse, and decreases in sensory response. This would be followed by the "confusion stage," 0.18 to 0.30, and the "stupor stage," between 0.27 and 0.40, each bringing markedly greater impairment in balance, coordination, sensory perception, mental acuity, and emotional control, culminating in a general lack of mobility and overwhelming apathy.
Dr. Staubus was also asked about the effects of the drug ecstasy, which was detected in Kara's body after her death. Dr. Staubus testified that this drug increases heart rate and blood pressure, causes mental and physical stimulation leading to increased physical activity and, often, enhanced sexual activity. Dr. Staubus testified that ecstasy is known to have caused otherwise healthy individuals to die of ventricular fibrillation, an irregular, rapid heart beat, leading to sudden collapse and death from lack of oxygen to the brain.
The defense also called Dennis Eshbaugh, a psychologist, who testified regarding the behavioral and mental aspects of acute intoxication particularly in relation to the phenomenon of "binge drinking." His comments largely paralleled those of Dr. Staubus regarding the psychological and mental effects of high levels of alcohol.
The final defense witness was Fawn She, an Ohio State student who was acquainted with both appellant and Kara. Ms. She began to testify regarding an occasion in which she had seen Kara at the Outland Club, which was described as an "SM" bar. The prosecution objected to this testimony, and the court sustained the objection. The defense thereafter made a proffer, out of the presence of the jury, of Ms. She's proposed testimony. Ms. She described the Outland Club as a place where individuals with special sexual preferences could engage in various restraint and bondage activities. Ms. She stated that there were chains on the wall where persons could be restrained and paddled or whipped, and seats where a person could be strapped down and receive electrical shocks. In addition, Ms. She stated that on the dance floor, almost any variety of sexual activity was permitted. In most bars, the bartenders or bouncers would place a limit to the acts permitted in public. Ms. She then described the various acts she had personally witnessed at the Outland Club when Kara was present and stated that Kara would necessarily have seen the same acts. Ms. She also stated that Kara did not participate in any of the sadomasochistic activity, but spent her time at the Outland Club dancing with friends. On this occasion Kara was dressed in an average manner, rather than the specialized costumes adopted by many of the patrons.
The defense also made a proffer of various pornographic images recovered from Kara's computer, the court having previously granted a motion in limine by the prosecution to bar admission of this evidence. The images were entered into the record under seal on computer media.
At the close of trial the jury returned verdicts of guilty to count one of the indictment, kidnapping, and count two, rape. With respect to the third count of the indictment, aggravated murder, specifying that appellant had purposefully and with prior calculation and design caused the death of Kara Parrish, the jury returned a verdict of guilty only to the lesser-included offense of voluntary manslaughter. On counts four and five of the indictment, each charging aggravated murder for purposefully causing the death of Kara Parrish while committing, respectively, kidnapping and rape, the jury returned verdicts of guilty of the lesser-included offense of murder. The court found that counts three, four, and five would merge for purposes of sentencing, and the state elected to proceed to sentencing on count five. The indictment contained sexual motivation (R.C. 2941.147) specifications for counts one and five, and sexually violent predator specifications (R.C. 2941.148) on counts one, two, and five. All these were tried to the bench and the trial court found appellant guilty of all the above specifications.
The court imposed ten year to life sentences for the kidnapping and the rape counts, and life without parole for the murder count selected for sentencing, all sentences to be served consecutively.
Appellant has timely appealed. Through counsel, he has filed a brief bringing the following assignments of error:
"FIRST ASSIGNMENT OF ERROR: The court erroneously overruled appellant's motion to suppress statements.
"SECOND ASSIGNMENT OF ERROR: The court improperly restricted the defense in the introduction of evidence supporting the claim sexual activity between the defendant and the victim was consensual.
"THIRD ASSIGNMENT OF ERROR: The court erroneously instructed the jury that intoxication is an affirmative defense on which appellant bore a burden of proof by a preponderance of the evidence.
"FOURTH ASSIGNMENT OF ERROR: Appellant's conviction for kidnapping as charged in count one, rape as charged in count two, and murder as charged in counts four and five are not supported by the evidence and are against the manifest weight of the evidence.
"FIFTH ASSIGNMENT OF ERROR: Appellant's conviction voluntary manslaughter as a lesser included offense to count three of the indictment is not supported by the evidence and is against the manifest weight of the evidence.
"SIXTH ASSIGNMENT OF ERROR: The evidence does not support the finding appellant is a sexually violent predator. Such finding is against the manifest weight of the evidence.
"SEVENTH ASSIGNMENT OF ERROR: The court erroneously admitted opinion testimony as to appellant's truthfulness in his statement to detectives following his arrest.
"EIGHTH ASSIGNMENT OF ERROR: Kidnapping, as charged in count one of the indictment, and rape, as charged in count two, are allied offenses of similar import committed with a single animus. The court erred by imposing consecutive 10-year to life sentences for the two offenses when it should have directed the prosecutor to elect on which offense conviction would be entered and sentence pronounced."
In addition, this court has granted appellant's motion for leave to file a pro se brief. That brief assigns the following additional assignments of error:
"FIRST ASSIGNMENT OF ERROR: The trial court erred to the substantial prejudice of the defendant when it constructively amended the indictment and instructed the jury on elements that were not included in the original charges, thereby broadening the basis for conviction beyond that of the indictment and allowing the defendant to be convicted of a crime that was not charged in the indictment.
"SECOND ASSIGNMENT OF ERROR: The trial court erred to the substantial prejudice of the defendant when it accepted guilty verdicts from the jury that were in clear disregard of the court's instructions when such verdicts are contrary to law and were precluded by the doctrine of collateral estoppel."
We will first address the assignments of error raised in appellant's brief submitted by counsel. The first assignment of error therein asserts that the trial court erred in failing to suppress certain statements made by appellant during an interview with police when he was questioned at police headquarters after his arrest. Although the statements made by appellant during this post-arrest interview were not used during the jury phase of the trial, they were used during the bench trial of the sexual motivation and sexually violent predator specifications after the jury returned its guilty verdicts.
The questioning began at 8:55 a.m. and was videotaped. Prior to questioning appellant was advised of his rights as required by Miranda v. Arizona (1966), 384 U.S. 436, and was shown a standard printed form including a waiver of his right to have counsel present at the questioning. In response to some of the standard preliminary questions, appellant stated that he had five pitchers of beer and about ten shots of alcohol the night before, but was presently not intoxicated. Appellant stated that he understood his rights, and refused to sign the waiver form. He nonetheless continued the interview with investigating officers, never asking for a lawyer or declaring that he wished to stop the interview. During the course of the interview he provided his version of events surrounding Kara's death, which he described as occurring suddenly and spontaneously as they engaged in sex.
Considering the issue of compliance with Miranda, the Ohio Supreme Court has stated:
"An express written or oral statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in Miranda v. Arizona [1966], 384 U.S. 436. (North Carolina v. Butler [(1979), 441 U.S. 369], followed.)"
State v. Scott (1980), 61 Ohio St.2d 155, paragraph one of the syllabus.
Counsel for appellant acknowledges that appellant's refusal to sign the written waiver is not of itself conclusive in the present case, but argues that the totality of the circumstances indicates a lack of knowing waiver by appellant. Pursuant to State v. Edwards (1976), 49 Ohio St.2d 31, a court should, in assessing the circumstances surrounding a purported waiver of Miranda rights, consider age, mentality, prior criminal experience, the length, intensity and frequency of interrogation, and the existence of physical deprivation or mistreatment as well as the existence of threat or inducement in determining whether a waiver is freely given.
In the present case, these factors support the voluntariness of appellant's willingness to answer questions in the absence of counsel. Appellant had significant prior experience with police interrogation in connection with crimes leading to two prison terms, one in California and one in Ohio, both for burglary, and possibly other felony arrests. Appellant on the interview tape refers to being "Mirandized," evidencing familiarity with the process. Appellant was 30 years old at the time of the arrest, a senior in college studying English, and appeared on the interview tape to clearly understand his rights in the interrogation procedure to which he was being subjected. The tape shows no evidence of abuse, deprivation, threats, or coercion of any nature, and the short duration of the interview (approximately one hour) also points to an absence of compulsion. Finally, appellant clearly stated that he was not under the influence of drugs, and his alcohol use the night before did not leave him intoxicated at the time of the interview.
Accordingly, based upon the totality of the circumstances, we agree with the trial court that appellant knowingly and voluntarily waived his right to counsel and continued to make voluntary answers to police officers when interviewed at police headquarters after his arrest. Appellant's first assignment of error is accordingly overruled.
The second assignment of error asserts that the trial court improperly excluded evidence which the defense sought to introduce to show that the sexual activity between appellant and Kara, including some use of restraint and force, was consensual. Appellant argues that use of force not consented to by Kara was essential to the offenses charged. If the nature of the sexual activity with Kara was consensual, including bondage, there could be no rape conviction; without restraint or rape, the kidnapping conviction, appellant argues, could not be supported. In the absence of either of these offenses, appellant further argues, the two felony murder convictions also would be precluded.
The trial court sustained the prosecution's motion in limine to prevent the defense from "inquiring or attempting to elicit from any witness the visitation or non-visitation, the presence or absence of porno sites on Kara Parrish's hard drive of her computer." (Tr. 347-348.) Other testimony established that such sexually oriented material had been found on Kara's computer, after the police had obtained the computer from her parents. When the issue arose again at trial, the prosecution argued that any testimony concerning pornographic images or website visits recorded on Kara's computer would be contrary to Ohio's rape shield law, R.C.2907.02(D). The trial court also excluded the testimony of Fawn She, who had been with Kara to a bar catering to persons interested in bondage, sadism, and masochism, on the same grounds.
In arguing against the potential testimony regarding Kara's visit to the bar in question, the state emphasized Ms. She's testimony that Kara's behavior at the Outland Club evinced little, if any, special interest in the activities there. With respect to the contents of the internet temporary file folder on Kara's computer hard drive, the state noted that there was no evidence that any material had actually been downloaded from the sites in question, and that the sites had been visited in 1999 and part of 2000, at a time when the computer was also used by Kara's two teenage brothers, as well as other periods of time when the computer was in Kara's apartment which she shared with others who had access to the computer. The state further argued that the material found on the computer did not contain the type of bondage or sexually explicit materials claimed by the defense, and that it was thus doubly speculative to assert both that Kara herself had visited the websites in question and that the websites indicated any interest in the sexual preferences asserted by the defense.
Ultimately, we agree with the prosecution's argument that one cannot make the speculative assertion, underlying the defense's theory of admissibility of evidence, that persons who own shared computers on which temporary internet folders of soft core pornography are preserved, in the absence of clear evidence that the computer owner in fact visited such sites, are more likely than not to engage in consensual bondage or submissive sexual conduct. We therefore find that the trial court did not abuse its discretion in finding this evidence inadmissible under Evid.R. 401, 404, and 405, as irrelevant and improper character evidence. With respect to the potential testimony from Ms. She, the same conclusion applies. In addition, it must be noted that Ms. She's testimony, when voir dired in the absence of the jury, was to the effect Kara did not herself engage in spanking, bondage, or any other type of restraint while at the bar, and did not appear more than casually interested in the activities at the bar. Appellant's second assignment of error is accordingly overruled.
Appellant's third assignment of error asserts that the trial court erred in instructing the jury that intoxication is an affirmative defense upon which appellant bore the burden of proof, rather than a circumstance which could negate the culpable mental state which the prosecution was required to show as an element of the offenses charged. The court instructed the jury as follows:
"Voluntary intoxication is an affirmative defense. The burden of going forward with the evidence of intoxication and the burden of proving an affirmative defense are upon the defendant. He must establish such a defense by a preponderance of the evidence.
"To determine whether the defendant was influenced by the effect of alcohol to such an extent that his mind could not and did not form a purpose to commit aggravated murder or murder, then he is not guilty of aggravated murder or murder as purpose is an essential element of the offense charged in the indictment." (Tr. 943-944.)
Trial counsel for appellant did not object to this instruction and, in fact, the instructions given to the jury were based upon a joint written submission of jury instructions by both the defense and prosecution. A defendant may not assert error on appeal based upon a failure to give an instruction or upon an incorrect instruction unless objection is made before the jury retires to consider its verdict. Crim.R. 30(A). In the present case, the instructions were not objected to, and resulted from a joint submission of counsel. Under such circumstances, not even the plain error standard under Crim.R. 52 might permit review of the matter. However, we will nonetheless consider the issue under the plain error standard. In order to constitute plain error, the error alleged must be obvious on the record, palpable, and fundamental such that it would have been apparent to the trial court without objection. State v. Tichon (1995), 102 Ohio App.3d 758. Plain error will not be found unless the appellant establishes that "the outcome of the trial would clearly have been different but for the trial court's allegedly improper actions." State v. Waddell (1996), 75 Ohio St.3d 163, 166. Notice of plain error is to be taken with utmost caution, only under exceptional circumstances, and only to prevent a manifest miscarriage of justice. State v. Phillips (1995), 74 Ohio St.3d 72, 83.
Compounding the difficulty of finding error on this issue is the fact that in Ohio, voluntary intoxication has been disfavored as a condition negating the mens rea element of specific intent crimes: "[I]ntoxication, even severe intoxication, can co-exist with purpose. The issue of intoxication is not raised as a defense to the element of purpose in a criminal prosecution merely because the evidence suggests reduced inhibitions, impaired judgment or blurred appreciation by the defendant of the consequences of his conduct." State v. Hicks (1989),43 Ohio St.3d 72, 74.
In the present case, there was conflicting evidence about appellant's state of intoxication prior to Kara's death. Neighbors testified that appellant was quite intoxicated when he returned home with Kara. The testimony of bartenders and drinking companions indicated a lesser state of intoxication. Most significantly, the testimony of Anthony Bell, who responded to appellant's call and arrived at appellant's apartment very soon after Kara's death, was that appellant appeared coherent and fully functional at that time. Appellant thereafter picked up Kara's body and, carrying her on his shoulder, descended a 15-step flight of stairs, after which he placed her in her car where her body was found.
Based upon this testimony at trial, even considering the testimony of neighbors regarding appellant's state of intoxication and the expert testimony of Mr. Staubus regarding the impact of the amount of alcohol consumed by appellant, it is apparent that the jury had evidence before it which would easily permit the conclusion that appellant was not so intoxicated as to be unable to form the requisite intent to support the mens rea of "purposely" as an element of murder. We accordingly find that the plain error standard is not met in the present case, and that the trial court's error in instructing the jury that voluntary intoxication could only be considered as an affirmative defense does not warrant reversal. Appellant's third assignment of error is accordingly overruled.
Appellant's fourth assignment of error asserts that the evidence presented at trial was insufficient to support his convictions for rape, kidnapping, and murder, or that these convictions are against the manifest weight of the evidence. The Ohio Supreme Court in State v. Thompkins (1997), 78 Ohio St.3d 380, set forth the following standard for a court addressing an appeal from a criminal conviction based upon a claim that the verdict is against the manifest weight of the evidence:
"* * * `The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' * * *"
Id. at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. When reviewing a conviction on manifest weight of the evidence, we do not construe the evidence most strongly in favor of the state. Instead, we must engage in a limited weighing of the evidence to determine whether there is sufficient, competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387.
In contrast, the legal concept of sufficiency of the evidence to support a conviction involves a different determination. Thompkins, supra, at 386. " '[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Id., quoting Black's Law Dictionary (6 Ed. 1990) 1433. Thus, a determination as to whether the evidence is legally sufficient to sustain the verdict is a question of law. Thompkins, at 386. The relevant inquiry upon a review of the sufficiency of the evidence is whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia (1979), 99 S.Ct. 2781, 2789. A reversal based on insufficient evidence has the same effect as a not guilty verdict, and thus precludes retrial, because such a determination "means that no rational factfinder could have voted to convict the defendant." Tibbs v. Florida (1982), 102 S.Ct. 2211, 2218.
Appellant asserts that, applying these standards, the jury could not reasonably have concluded that the prosecution proved beyond a reasonable doubt that appellant used force or the threat of force to compel Kara to engage in sexual activity, the essential element of the rape charge in the present case, or that appellant restrained Kara against her will, the essential element of the kidnapping charge.
In the absence of rape or kidnapping, appellant argues, both the felony murder counts would also fail.
Even a brief review of the evidence in the case refutes this assertion. The state was able to demonstrate through the testimony of Dr. Fardall, as well as photographic exhibits, that Kara suffered numerous injuries to her face, head, neck, throat, trunk, shoulders, arms, and legs, to illustrate the force to which she was subjected. Dr. Fardall testified about the extent of injury to Kara's anus, which suffered two minor tears, as well as a laceration to the colon with sperm present. Both Dr. Fardall's testimony and the photographs admitted at trial established the bruises and ligature marks about Kara's wrists and ankles, and these marks were consistent with an electrical cord recovered from appellant's apartment and submitted as an exhibit by the state.
Prosecution witness Lawrence Wolfe, Jr., testified that he heard a woman scream and state "get off of me, you are hurting me and choking me," and that he heard defendant saying "I will tie you up." (Tr. 58-59.) Mr. Wolfe thereafter called 9-1-1 and reported the disturbance, leading to an unsuccessful response by police that night. Mr. Wolfe reiterated his report to the police the following day. Appellant stipulated the state's DNA report that established that the semen recovered from Kara belonged to appellant. Finally, and perhaps most significantly, appellant's own brother testified that, immediately after Kara's death, appellant admitted to killing her, gave his motive as fear of blackmail, and sought assistance in disposing of the body.
All the above constitutes sufficient credible evidence which, if believed, would establish beyond a reasonable doubt that appellant committed the crimes of rape, kidnapping, and consequently felony murder. The evidence also supports the pro-position that the jury did not lose its way in returning the verdicts, given that the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. We therefore conclude that appellant's convictions are supported by both sufficient evidence and are not against the manifest weight of the evidence. Appellant's fourth assignment of error is accordingly overruled.
Appellant's fifth assignment of error asserts that appellant's conviction of voluntary manslaughter as a lesser-included offense of count three, aggravated murder based on prior calculation and design, is also against the manifest weight of the evidence. This count merged for sentencing with the felony murder counts four and five of the indictment.
R.C. 2903.03(A) defines the offense of voluntary manslaughter as follows: "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another." The offense of voluntary manslaughter therefore differs from murder under R.C. 2903.02, upon which the jury was also instructed in the case, because of the element of provocation and the mens rea of knowingly, as opposed to purposely, causing the death of another. It further differs from the offense of aggravated murder, which was the highest offense charged under count three of the indictment, because of the absence of the prior calculation and design. R.C.2903.01(A).
The culpable mental state of knowledge is defined by R.C. 2901.22: "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).
Although the most characteristic aspect of the offense of voluntary manslaughter is typically the mitigating circumstance of provocation, this court has held that the offense of voluntary manslaughter under R.C. 2903.03 creates the offense of knowingly causing the death of another, even without the presence of provocation. State v. Holt (May 18, 1989), Franklin App. No. 88AP-1080; State v. Tuney (Aug. 15, 1991), Franklin App. No. 90AP-656.
As set forth in our discussion of appellant's fourth assignment of error, the evidence was sufficient to support a verdict that appellant purposely caused the death of Kara Parrish, leading to murder convictions under counts four and five of the indictment. The evidence was also sufficient, therefore, to support the lesser mens rea of knowingly causing her death, and giving rise to the manslaughter conviction under count three of the indictment. For the reasons stated above, appellant's fifth assignment of error is accordingly overruled.
Appellant's sixth assignment of error asserts that the trial court erred in determining appellant to be a sexually violent predator, defined in R.C. 2971.01(H)(1) as "a person who has been convicted of or pleaded guilty to committing * * * a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." Rape is a "sexually violent offense," as is kidnapping where the offender is also convicted of a sexual motivation specification, and as is murder with a similar specification. R.C. 2971.01(G); R.C. 2971.01(L). R.C.2971.01(H)(2) sets forth the following factors which may be considered in making a sexually violent predator determination:
"(2) For purposes of division (H)(1) of this section, any of the following factors may be considered as evidence tending to indicate that there is a likelihood that the person will engage in the future in one or more sexually violent offenses:
"(a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.
"(b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.
"(c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.
"(d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.
"(e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.
"(f) Any other relevant evidence."
Because appellant does not have a prior history of conviction for sexually oriented offenses, the applicable section in the present case is R.C. 2971.01(H)(2)(e), which is amply fulfilled on the present facts, given the harm inflicted on Kara Parrish culminating in her death. The trial court also considered R.C. 2971.01(H)(2)(d), finding that appellant's restraint of Kara and the signs of physical violence she bore were indicative of torture. The court also noted appellant's apparent lack of remorse or emotion, as reflected in detective Marsh's testimony at the hearing regarding appellant's demeanor in the interview immediately after his arrest.
In opposition to the state's evidence at the sexually violent predator hearing, the defense presented a report prepared by Dr. Eshbaugh, who had also testified during the jury phase of the trial. Dr. Eshbaugh assessed appellant's aggressive and sexual tendencies, and concluded that, with the exception of the factor of alcohol abuse on the part of appellant, his overall professional opinion was that appellant presented a low risk from committing sexually violent offenses in the future. Dr. Eshbaugh principally noted appellant's lack of a history of mental disorder or personality problems, good adjustment in primary and secondary education, lack of history of impulsivity, and reasonably stable employment history. Dr. Eshbaugh also noted that, although appellant had prior adult felony convictions for theft-related crimes, he had no prior history of violent or sexual offenses.
The standard of proof applicable to a determination of whether an offender is guilty of a sexually violent predator specification is proof beyond a reasonable doubt. State v. Jones (2001), 93 Ohio St.3d 391. We consider the question of whether the verdict is supported by the evidence on this issue under the same standard applied in our discussion of the general jury verdict above. We find that the evidence in the present case supports the trial court's conclusion, summarized in the trial court's oral decision rendered from the bench:
"The evidence in this case shows that the defendant tortured the victim by sexually imposing himself upon her, binding her so she was defenseless to his advances and then raped her anally. The physical marks on the victim stand as testament to the ruthless nature of these offenses and suffering of the victim prior to losing her life. The defendant's brutal actions physically harmed the victim to the degree that her life was not only in jeopardy but was taken from her, and the court finds that this evidence satisfies [R.C.] 2971.01(H)(2)(d) and (e).
"* * *
"The court is familiar with the defendant's statements made to the detective and has independently made my own analysis and finds that many statements made by the defendant were inconsistent and were self-serving statements." (Tr. at 1021-1022.)
We find no reason to conclude that the trial court's conclusion is against the manifest weight of the evidence or not supported by sufficient evidence, and appellant's sixth assignment of error is accordingly overruled.
Appellant's seventh assignment of error asserts that the trial court erred in admitting opinion testimony regarding appellant's truthfulness in a statement to the detectives following his arrest. This again relates to the sexually violent predator specification hearing, since appellant's statements to the detectives were not admitted during the jury phase of the trial. On redirect examination, the state's witness at the hearing, Detective Marsh, testified that he believed some of the statements made by appellant during his post-arrest interview were false. Counsel for appellant objected to the direct question eliciting an opinion of truthfulness.
We agree with appellant that lay opinion is generally inadmissible with respect to truthfulness or veracity. State v. Flaherty (1992),78 Ohio App.3d 718. In the context of the present case, however, error on the part of the trial court in this respect is harmless. The opinion testimony was not admitted before the jury, but before an aspect of the case tried to the bench, and the experienced trial court judge can be assumed to have appropriately disregarded the inadmissible statements. Moreover, in her own assessment of the evidence, the judge after viewing the tape of appellant's interview with detectives stated that she was "familiar with the defendant's statements made to the detective and ha[s] independently made [her] own analysis and [found] that many statements made by the defendant were inconsistent and self-serving statements." (Tr. 1022.) The court thus appeared to implicitly acknowledge that admission of the opinion testimony by Detective Marsh was in error, but that the trial court's own assessment of appellant's veracity was supported by, among other things, appellant's demeanor during the taped interview. We therefore find that to the extent any error occurred in admitting a small item of improper testimony, no prejudice can be shown to appellant and appellant's seventh assignment of error is accordingly overruled.
Appellant's eighth assignment of error asserts that the trial court erred in imposing consecutive ten year to life sentences for the two offenses of kidnapping and rape. Appellant asserts that the offenses, if the convictions are allowed to stand, should be found to be allied offenses of similar import committed with a single animus, and that the court should have directed the prosecutor to elect one of the two offenses for sentencing purposes.
Pursuant to R.C. 2941.25, when identical conduct can be construed to constitute two or more offenses of similar import, separate counts of an indictment may result in conviction and sentence for only one offense. Appellant concedes on appeal that it was proper to submit both count one, kidnapping, and count two, rape, to the jury, but asserts that following the jury verdicts, conviction should be entered only on a single count to be elected by the prosecution.
Determination of whether two offenses consist of allied offenses of similar import turns on examination of the statutorily defined elements of the two offenses. State v. Donald (1979), 57 Ohio St.2d 73. The offense of forcible rape is defined in R.C. 2907.02(A)(2): "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
The pertinent portion of the kidnapping statute is R.C. 2905.01(A):
"No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
"(1) To hold for ransom, or as a shield or hostage;
"(2) To facilitate the commission of any felony or flight thereafter;
"(3) To terrorize, or to inflict serious physical harm on the victim or another;
"(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will;
"(5) To hinder, impede, or obstruct a function of government, or to force any action or concession on the part of governmental authority."
The restraint inherent in any threat or use of force generally makes any rape under R.C. 2907.02(A)(2) meet the elements of kidnapping under the restraint element of R.C. 2905.01(A)(4). In addition, the restraint element of rape may also meet the definition of kidnapping under R.C.2905.01(A)(2), since it facilitates the commission of a felony. The indictment alleging kidnapping in the present case used the language from both of these subdivisions in setting forth the elements of the crime.
The question of whether kidnapping and rape will be considered to have been committed separately or with a common animus was addressed in the syllabus of State v. Logan (1979), 60 Ohio St.2d 126:
"In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:
"(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
"(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions."
In the present case, we find that there was evidence of a separate animus sufficient to support independent conviction and sentencing on both kidnapping and rape. Testimony of Lawrence Wolfe, as well as the timing of other events culminating in the arrival of appellant's half-brother at the scene, suggest a fairly long period of restraint. Appellant stated to his brother that Kara had died just minutes prior to appellant telephoning Anthony. Wolfe's call to 9-1-1 occurred over an hour earlier in the evening, yet at that time, Wolfe reported hearing Kara screaming and appellant threatening to tie her up, and indicated that the noise had been going on for some time. Thus, the restraint was prolonged, under paragraph (a) of the syllabus of Logan, and separate animus could be found. Moreover, under part (b) under the syllabus of Logan, it is clear in this case that the restraint of Kara subjected her to a substantial increase and risk of harm separate and apart from the underlying crime. Kara was bound hand and foot, probably with an electrical cord, which not only facilitated the rape, but must have substantially increased the danger of asphyxiation since she was not able to defend herself or even free to move her arms or otherwise to reposition herself and avoid dangerous compression upon her neck. We therefore find that the trial court did not err in finding that a separate animus existed for the crimes of kidnapping and rape in this case, and independent sentences on the two crimes were appropriate. Appellant's eighth assignment of error is accordingly overruled.
The two assignments of error raised in appellant's pro se appellate brief will be addressed, for convenience of nomenclature, as appellant's ninth and tenth assignments of error. In the ninth assignment of error, appellant asserts that the trial court erred by instructing the jury on the lesser-included offense of murder when appellant was charged with aggravated murder. Appellant asserts that, in fact, felony murder under R.C. 2903.02(B) is not a lesser-included offense of R.C. 2903.01(B), felony aggravated murder. Appellant bases this conclusion on the fact that R.C. 2903.01(B) lists a greater variety of supporting felonies for aggravated murder than does R.C. 2903.02(B) for murder. The supporting felonies for aggravated murder are given as kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, or escape. R.C. 2903.01(B). For murder, the supporting felonies are given only as felonies of the first or second degree, excluding voluntary manslaughter and manslaughter. R.C. 2903.02(B). Appellant correctly points out that an offense may be considered a lesser included offense of another if: (1) the offense carries a lesser penalty than the other; (2) the greater offense cannot ever be committed without the lesser offense also being committed; and (3) some element of the greater offense is not required to prove the commission of the lesser offense. State v. Deem (1988), 40 Ohio St.3d 205, paragraph three of the syllabus. Appellant argues that the second prong of Deem is not met, since it is possible to commit felony aggravated murder based on, for example, robbery, which is under some conditions a felony of the third degree, R.C. 2911.02(B), without meeting the elements of simple felony murder under R.C. 2903.02(B), which requires a first or second degree felony.
Appellant raises a point which can be debated in other circumstances, but not on the facts of this case. Both the underlying felonies committed by appellant, kidnapping and rape, were first degree felonies as charged. R.C. 2905.01(C); R.C. 2907.02(B). They therefore supported either a charge of felony murder under R.C. 2903.02(B) or felony aggravated murder under R.C. 2903.01(B). Since, as charged, all the offenses met the three prongs of Deem, and murder could properly be considered a lesser-included offense of aggravated murder, appellant's ninth assignment of error is without merit and is overruled.
Appellant's tenth assignment of error asserts that the trial court erred in accepting guilty verdicts from the jury when the verdicts were contrary to the jury instructions and precluded by the doctrine of collateral estoppel. Appellant asserts that the trial court in this case instructed the jury that if they did not find that appellant had a purpose to kill then the jury was barred from convicting appellant on any homicide offense in which purpose was an element. Appellant asserts that it is inconsistent for the jury to return a verdict of not guilty of aggravated murder or murder (purposely causing the death of Kara Parrish), on count three, returning instead a verdict of manslaughter reflecting the lower mens rea of knowingly causing her death, while simultaneously returning on counts four and five murder verdicts with the higher mens rea of purposely causing her death during the commission of the crimes of kidnapping and rape. We find that the verdicts rendered by the jury are not grounds for collateral estoppel to bar the murder convictions, as claimed by appellant. The various counts of a multiple indictment are not interdependent and an inconsistency in verdicts will not give rise to error if it arises out of different counts, as opposed to inconsistent responses to the same count. State v. Adams (1978),53 Ohio St.2d 223; State v. Lovejoy (1997), 79 Ohio St.3d 440. Appellant's tenth assignment of error is accordingly overruled.
In summary, based upon the foregoing, appellant's ten assignments of error are overruled, and the judgment of conviction and sentence entered by the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
TYACK, P.J., and McCORMAC, J., concur.
McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.